IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Cathy Isaacs, | ) | C/A No.: 1:15-4420-TMC-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Carolyn W. Colvin, Acting | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civ. Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her claim for Disability Insurance Benefits ("DIB"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the undersigned recommends that the Commissioner's decision be reversed and remanded for further proceedings as set forth herein.

I.    Relevant Background

A.    Procedural History

On November 26, 2012, Plaintiff protectively filed an application for DIB in which she alleged her disability began on August 1, 2007. Tr. at 76 and 156–57. Her application was denied initially and upon reconsideration. Tr. at 97–100 and 101–05. On

July 31, 2014, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Edward T. Morriss. Tr. at 27–61 (Hr'g Tr.). The ALJ issued an unfavorable decision on October 29, 2014, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 11–26. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–7. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on October 30, 2015. [ECF No. 1].

B.    Plaintiff's Background and Medical History

1.    Background

Plaintiff was 59 years old at the time of the hearing. Tr. at 30. She completed high school and obtained an associate's degree in administrative office technology. *Id.* Her past relevant work ("PRW") was as a human resources clerk and a secretary. Tr. at 73–74. She alleges she has been unable to work since August 1, 2007.[1] Tr. at 156.

2.    Medical History

On July 10, 2007, Plaintiff presented to Brian D. Forbus, PA-C ("Mr. Forbus"), in the office of Jeffrey C. Wilkins, M.D. ("Dr. Wilkins"), for an initial pain management evaluation. Tr. at 282–84. She reported pain in her low back and pain and numbness in her right knee. Tr. at 282. She endorsed increased stress as a result of problems with family and work. *Id.* She complained of bladder incontinence and decreased sleep. *Id.*

---

[1] In her application, Plaintiff alleged her disability began on August 1, 2007. Tr. at 156. However, during the hearing, Plaintiff's attorney moved to amend her alleged onset date of disability to January 5, 2010, to coincide with her 55th birthday. Tr. at 59. The ALJ did not formally grant the motion, and his decision reflects the original alleged onset date of August 1, 2007. Tr. at 16, 21, and 59.

Mr. Forbus observed Plaintiff to "hop on and off the table without difficulty" and "without an assistive device." Tr. at 283. He indicated Plaintiff was tender to palpation in her right gluteus region, but noted no other abnormalities. Tr. at 283–84. Dr. Wilkins prescribed Zonegran and 30 milligrams of Avinza, but indicated he would gradually increase her dosage. Tr. at 284.

Plaintiff indicated Avinza was working fairly well on August 14, 2007. Tr. at 350. She reported pain in her right lower extremity and stated her knee was giving out on her. *Id.* She also complained of sleep disturbance. *Id.* Mr. Forbus referred her for a sleep study and magnetic resonance imaging ("MRI") of her lumbar spine. *Id.*

On September 24, 2007, Plaintiff complained of severe low back pain. Tr. at 349. Mr. Forbus indicated the MRI of Plaintiff's lumbar spine showed significant multilevel degenerative disc disease with significant foraminal stenosis at L3-4 and L4-5. *Id.* He noted rotatory scoliosis of the entire lumbar spine. *Id.* He referred Plaintiff for physical therapy with emphasis on lumbar traction. *Id.*

A sleep study showed Plaintiff to have moderate obstructive sleep apnea hypopnea syndrome. Tr. at 357. On October 22, 2007, Dr. Wilkins referred Plaintiff for a Continuous Positive Airway Pressure ("CPAP") titration study. Tr. at 348. He provided Plaintiff a work note that addressed her standing and sitting intolerance. *Id.*

On March 24, 2008, Plaintiff indicated she was slowly increasing her activity level and was happy with her improvement. Tr. at 343. Dr. Wilkins made no changes to Plaintiff's medications. *Id.*

Plaintiff presented to Mr. Forbus with multiple complaints on October 28, 2008. Tr. at 339. She asked Mr. Forbus whether she should pursue disability benefits, but he stated he felt like Plaintiff "could provide an employer with vocational benefits" and "would make a good employee on a limited basis if need be." *Id.* Plaintiff indicated she had worked 60 hours per week in the past. *Id.* Mr. Forbus indicated he did not recommend she go back to her past work, but felt she could perform a job that allowed for rest breaks, an ability to alternate sitting and standing frequently, and limited climbing of stairs, bending, twisting, and kneeling. *Id.* He observed that Plaintiff was "significantly tearful" and seemed "somewhat melancholy/worried." *Id.* He assessed depression/anxiety and chronic low back pain. *Id.*

On March 11, 2009, Plaintiff reported a recent flare-up of pain. Tr. at 337. On December 22, 2009, she complained of pain in her low back and left lower extremity. Tr. at 333. Mr. Forbus referred her for physical therapy. *Id.*

Plaintiff reported poor sleep on January 26, 2010. Tr. at 332. Dr. Wilkins indicated Plaintiff had "some primary insomnia not evident of sleep study," and prescribed Restoril. *Id.*

On May 18, 2010, Plaintiff reported to Dr. Wilkins that she was experiencing increased pain as a result of extensive walking. Tr. at 330. Dr. Wilkins advised her "not to do a lot of walking." *Id.* He indicated he would refer Plaintiff for a new MRI to determine if she may be a candidate for any of the newer treatment procedures. *Id.*

Dr. Wilkins discharged Plaintiff from his practice on November 2, 2010, after she attempted to avoid a urine drug screen and subsequently failed it. Tr. at 329.

On December 6, 2010, Plaintiff reported to James Vest, M.D. ("Dr. Vest"), that she was experiencing numbness in her legs and swelling in her feet. Tr. at 260. Dr. Vest referred her for an MRI of her lumbar spine. *Id.*

On January 6, 2011, Plaintiff presented to Gregory Kang, M.D. ("Dr. Kang"), with a complaint of chronic back pain. Tr. at 280. She indicated she had been treated by Dr. Wilkins in the past, but that he had discharged her for failing a urine drug screen. *Id.* She indicated her pain was worsened by bending, stooping, lifting, and standing. *Id.* Dr. Kang indicated Plaintiff had normal shoulder range of motion ("ROM") to forward flexion and abduction; positive back extension and facet loading maneuvers; a loss of lordosis in her lumbar spine; acquired thoracolumbar scoliosis; and negative straight-leg raising ("SLR") test. *Id.* A neurological examination was normal. *Id.* Dr. Kang's diagnostic impressions included lumbar degenerative disc disease; thoracolumbar scoliosis; and aberrant drug-taking behavior. *Id.*

Plaintiff underwent magnetic resonance imaging ("MRI") of her lumbar spine on February 3, 2011. Tr. at 250–51. Richard C. Holgate, M.D., interpreted the MRI to show multilevel moderately severe spondylosis occurring in the context of moderate to severe scoliosis with probable root compression at L3-4, L4-5, and L5-S1. *Id.*

On February 10, 2011, Daniel R. Butler, PA-C ("Mr. Butler), reviewed the MRI results and recommended Plaintiff undergo a lumbar epidural steroid injection ("LESI") at the L5-S1 level. Tr. at 233. Leonard E. Forrest, M.D. ("Dr. Forrest"), administered the LESI on February 15, 2011. Tr. at 234.

Plaintiff reported relief from the LESI on February 28, 2011. Tr. at 277. Dr. Kang indicated he would consider reducing her dose of Avinza if she continued to report improvement at her next visit. *Id.*

On March 15, 2011, Plaintiff reported to Mr. Butler that she received some immediate relief from the LESI, but that her pain was slowly returning. Tr. at 235. Mr. Butler indicated Plaintiff's diagnoses included scoliosis and central and foraminal stenosis at L4-5 and L5-S1. *Id.* They discussed possible surgery, but Plaintiff indicated she was not ready for surgery. *Id.* Mr. Butler recommended an LESI at L4-5, which was administered by Dr. John F. Johnson, M.D. ("Dr. J. Johnson"). Tr. at 235, 236.

On March 29, 2011, Plaintiff reported to Dr. Kang that she unsuccessfully attempted to reduce her Avinza dosage. Tr. at 279.

Plaintiff again reported improvement to Mr. Butler on April 12, 2011. Tr. at 237. Mr. Butler recommended she engage in six to eight weeks of physical therapy for core lumbar stabilization. *Id.* Dr. Forrest administered an LESI at L5-S1. Tr. at 238.

On April 14, 2011, Dr. Kang observed Plaintiff to ambulate with a brisk and steady pace, but to have bilateral lumbar paraspinal tenderness and a slightly kyphotic/scoliotic posture. *Id.* He refilled Plaintiff's prescriptions for Avinza, Celebrex, and Zonegran and scheduled her for core strengthening therapy. *Id.*

Plaintiff presented to Dr. J. Johnson for a consultation on June 7, 2011. Tr. at 239. Dr. J. Johnson noted that the MRI showed "fairly severe scoliosis as well as significant stenosis at 4-5 and 5-1." *Id.* He noted Plaintiff had "been on an enormous amount of pain medicine, 120 mg of Avinza in the daytime and 30 mg at nighttime" and recommended

she follow up with a chronic pain medicine expert. *Id.* He also indicated Plaintiff may be a candidate for rhizotomy and for a spinal cord stimulator. *Id.*

On June 28, 2011, Plaintiff presented to pain medicine specialist William Blane Richardson, M.D. ("Dr. Richardson"), for an evaluation. Tr.at 240–42. Plaintiff indicated she experienced constant pain that was exacerbated by ambulating 10 to 15 steps and reduced by sitting. Tr. at 240. She reported that her pain affected her sleep, appetite, concentration, physical activity, emotional lability, and social relationships. *Id.* She denied bowel and bladder dysfunction and lower extremity weakness. *Id.* Dr. Richardson observed Plaintiff to have 1+ deep tendon reflexes ("DTR") at the patella and Achilles; 4/5 strength at the quadriceps/hamstrings and with plantar flexion and extension; decreased ROM with hip flexion and extension; positive facet loading bilaterally in the lumbar region; mild tenderness to palpation in the lumbar region; grossly intact sensation in the calf and foot; decreased sensation in the thigh; negative SLR test; negative Patrick's test; and grossly intact cranial nerves. Tr. at 242. He recommended Plaintiff detox from her pain medications with Suboxone therapy and follow up for possible interventional therapy. *Id.*

On July 11, 2011, Plaintiff reported to Dr. Kang that her medications continued to work well and that she had no desire to change them. Tr. at 273. However, she noted that Dr. Richardson had recommended she go through detox to discontinue use of narcotics. *Id.*

Plaintiff presented to E. Nicole Cogdell-Quick ("Ms. Cogdell-Quick"), for a psychiatric diagnostic interview examination on September 8, 2011. Tr. at 420–22. Ms.

Cogdell-Quick's diagnostic impressions included opioid dependence; pain disorder associated with psychological factors and medical condition; dysthymic disorder; posttraumatic stress disorder ("PTSD"); personality disorder, not otherwise specified ("NOS"), and rule out obsessive compulsive personality disorder. Tr. at 420. She estimated Plaintiff's Global Assessment of Functioning ("GAF")[2] score to be 55. *Id.* She indicated Plaintiff was well-oriented in all spheres; appeared alert; demonstrated an appropriate affect; had a euphoric mood; maintained eye contact; used logical and coherent speech; had normal recent and remote memory; demonstrated normal movements and psychomotor activity; exhibited a moderate degree of conceptual disorganization; had no significant preoccupations and denied hallucinations; demonstrated an open and cooperative attitude; was partially aware of her problems; showed fair judgment; was able to attend and maintain focus; and was reflective and able to resist urges. Tr. at 421.

On September 9, 2011, Plaintiff reported to Dr. Kang that she was no longer taking Avinza and that she felt much better without the Morphine in her system. Tr. at 272. She indicated she continued to experience back pain, but noted it was "quite tolerable." *Id.* Dr. Kang noted that Plaintiff continued to have bilateral lumbar paraspinal

---

[2] The GAF scale is used to track clinical progress of individuals with respect to psychological, social, and occupational functioning. American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Disorders*, Fourth Edition, Text Revision. Washington, DC, American Psychiatric Association, 2000 ("*DSM-IV-TR*"). The GAF scale provides 10-point ranges of assessment based on symptom severity and level of functioning. *Id.* If an individual's symptom severity and level of functioning are discordant, the GAF score reflects the worse of the two. *Id.*

tenderness and a slightly kyphotic/scoliotic posture, but indicated she had no new deficits. *Id.*

On November 28, 2011, Plaintiff presented to Dr. Vest for medication refills. Tr. at 257. She indicated she was experiencing stress as a result of a death in her family. *Id.* Dr. Vest refilled Plaintiff's medications. *Id.*

On February 7, 2012, Plaintiff indicated she was experiencing back pain for the first time since stopping Avinza. Tr. at 271. Dr. Kang observed Plaintiff to be ambulating at a steady pace; to show no signs of cognitive impairment; to have intact cranial nerves; to demonstrate bilateral lumbar paraspinal tenderness; and to have a slightly kyphotic/scoliotic posture. *Id.* She refilled Plaintiff's prescriptions for Zonegran and Celebrex and instructed her to follow up in six months. *Id.*

On March 6, 2012, Plaintiff followed up with Dr. Richardson. Tr. at 244. Dr. Richardson indicated Plaintiff had completed detox therapy in November 2011 and was only taking Tylenol as needed for pain. *Id.* Plaintiff indicated she was much more alert and was doing remarkably well. *Id.* However, she reported some depression as a result of "family issues." *Id.* She rated her pain as a four out of 10, but stated it had worsened. *Id.* She indicated she had been able to rake leaves and perform yard work. *Id.* Dr. Richardson noted the following findings on examination: 1+ DTR at the patella and Achilles; 4/5 strength in the quadriceps/hamstrings and on plantar flexion and extension; negative SLR test; negative Patrick's test; positive facet loading in the lumbar region; slightly decreased sensation in the thigh, buttock, calf, and toes, particularly on the right compared to the left; and grossly intact cranial nerves. Tr. at 244. He administered an LESI at Plaintiff's

L5-S1 level and referred her to a psychologist for coping skills and biofeedback techniques. Tr. at 243, 244.

Plaintiff reported no significant relief from the LESI on April 3, 2012. Tr. at 246. She endorsed a need to prop up her legs while sitting or lying down to reduce pain on her right hip. *Id.* She indicated she experienced the worst pain while standing or ambulating, but stated she had some pain while sitting for prolonged periods. *Id.* Dr. Richardson indicated the following findings on examination: 1+ DTR at the patella and Achilles; 4/5 strength in the quadriceps/hamstrings and on plantar flexion and extension; negative SLR test; negative Patrick's test; slightly decreased sensation in the thigh and buttock, but intact sensation in the right lower extremity at all levels; and grossly intact cranial nerves. *Id.* He recommended a medial branch block at Plaintiff's right L4-5 and L5-S1 levels, which he administered on April 17, 2012. Tr. at 245, 246.

On April 23, 2012, Plaintiff indicated Venlafaxine was ineffective and complained of facet joint pain. Tr. at 256. Dr. Vest referred her to a psychiatrist. *Id.*

On May 29, 2012, Plaintiff reported no change following the medial branch block. Tr. at 247. She complained of a dull, achy pain that she classified as a three out of 10. *Id.* Dr. Richardson noted the following findings on examination: 1+ DTR at the patella and Achilles; 4/5 strength in the quadriceps/hamstrings and on plantar flexion and extension; antalgic gait with use of a cane for ambulation; slightly decreased sensation in the thigh, buttock, and calf, but intact sensation in the foot; and grossly intact cranial nerves. *Id.* Dr. Richardson gave Plaintiff a spinal cord stimulator to try for two weeks. *Id.*

On September 13, 2012, Plaintiff reported suicidal thoughts, but denied having a suicide plan. Tr. at 255.

On October 16, 2012, Plaintiff indicated to Virginia G. Blease, PA-C ("Ms. Blease), that she was not interested in obtaining an implantable spinal cord stimulator because it would prevent her from having MRIs in the future. Tr. at 248. She endorsed bilateral lower extremity pain that was worsened by standing and walking. *Id.* She stated her pain was better with sitting, but indicated she felt a cold sensation in her legs while sitting. *Id.* Ms. Blease observed Plaintiff to have 5/5 strength in her lower extremities; to demonstrate intact dorsi and plantar flexion; to have a negative SLR bilaterally; to demonstrate 1+ reflexes in the lower extremities; to show normal muscle tone; to ambulate with an antalgic gait; to appear alert and oriented times three; and to have grossly intact cranial nerves. *Id.* She recommended Plaintiff proceed with a spinal cord stimulator, and Plaintiff agreed to do so. *Id.* She also referred Plaintiff for an updated lumbar MRI, which showed multilevel moderately severe spondylosis occurring in the context of a scoliosis with probable nerve root compression at T12-L1, L2-3, L3-4, L4-5, and L5-S1. Tr. at 252–53.

Plaintiff subsequently followed up with Dr. Richardson, who noted the recent MRI showed "slightly worsening degenerative disease and stenosis at L3-4 and 4-5 from her scan in 2011." Tr. at 249. He observed Plaintiff to have +1 DTRs at the patella and Achilles; 4/5 strength at the quadriceps/hamstrings and with plantar flexion and extension; negative SLR test; negative Patrick's test; slightly decreased sensation in her thigh, buttock, and calf; and grossly intact cranial nerves. Tr. at 249. He noted that

Plaintiff was still somewhat reluctant to undergo implantation of spinal cord stimulator and indicated a minimally invasive lumbar decompression ("MILD") procedure may be helpful. However, he deferred a decision on the course of treatment because of anticipated changes in procedures that may be covered by Plaintiff's insurance. *Id.*

On December 21, 2012, Lindsey Horton, LPC, NCC ("Ms. Horton"), indicated Plaintiff began counseling treatment on September 8, 2011, but did not engage in "consistent, meaningful treatment" until September 18, 2012, when she began attending weekly individual sessions. Tr. at 316. Ms. Horton indicated Plaintiff was "plagued by chronic pain, anxiety, depression, marital conflict, and limited support network." *Id.* She stated Plaintiff was "[e]xtremely preoccupied with anger, chronic health problems and self-imposed isolation." *Id.* She indicated Plaintiff's initial and most recent GAF scores to be 55. *Id.* The record contains progress notes from weekly counseling sessions from January 8, 2013, through March 26, 2013. Tr. at 374–96. Ms. Horton generally described Plaintiff's affect as subdued and her prognosis as guarded. *Id.* Plaintiff consistently had GAF scores of 55. *Id.*

Dr. Vest prescribed Cymbalta for depression and instructed Plaintiff to wean off Effexor on January 16, 2013. Tr. at 368. On January 31, 2013, Dr. Vest indicated Plaintiff's mental diagnoses included depression and anxiety. Tr. at 361. He described Plaintiff as being oriented to time, person, place, and situation; having an intact thought process; demonstrating appropriate thought content; showing a worried/anxious and depressed mood/affect; having good attention/concentration; having good memory; and exhibiting a slight work-related limitation in function. *Id.*

In February and March 2013, Ms. Horton indicated Plaintiff demonstrated poor motivation and moderate resistance, had difficulty focusing on one topic, avoided pertinent issues, and showed a minimal degree of compliance with treatment. Tr. at 383, 385, 387, 389, 392, and 395.

Plaintiff presented to psychologist Kenneth Lux, Ph. D. ("Dr. Lux"), for a consultative examination on March 5, 2013. Tr. at 362–65. Dr. Lux indicated Plaintiff's main problems were physical and indicated her emotional problems were a result of her physical problems and inability to work. Tr. at 364. He diagnosed adjustment disorder with depressed mood and anxiety, primary insomnia, and PTSD and assessed a GAF score of 55. *Id.* Dr. Lux provided the following clinical functional assessment:

> As indicated in the information above, Cathy's inability to work, after a successful career, is a result of her physical condition, centered around back and spinal problems. Even though she has other traumatic life issues which result in a low level PTSD profile, it is my estimation that these would not have led to her inability to work. In fact she is now beginning to deal with these, hopefully successfully, in counseling. But even if these become emotionally resolved I doubt that it will result in vocational capacity. Should medical treatment moderate or ameliorate her physical problems, then she may be able to resume working.

Tr. at 365.

State agency medical consultant Cleve Hutson, M.D. ("Dr. Hutson"), reviewed the record and completed a physical residual functional capacity ("RFC") assessment on March 8, 2013. Tr. at 70–73. Dr. Hutson indicated Plaintiff had the RFC to occasionally lift and/or carry 20 pounds; to frequently lift and/or carry 10 pounds; to stand and/or walk for a total of two hours during an eight-hour workday; to sit for about six hours during an eight-hour workday; to occasionally climb ramps and stairs, stoop, kneel, crouch, and

crawl; to never climb ladders, ropes, or scaffolds; and to work in jobs that required no concentrated exposure to hazards. *Id.* Lina B. Caldwell, M.D., assessed the same restrictions on July 3, 2013. Tr. at 86–89.

On March 15, 2013, state agency consultant Judith Von, Ph. D. ("Dr. Von"), reviewed the evidence and completed a psychiatric review technique form ("PRTF"). She considered Listings 12.04 for affective disorders, 12.06 for anxiety-related disorders, 12.07 for somatoform disorders, and 12.09 for substance addiction disorders. Tr. at 68–69. She determined Plaintiff had no restriction of activities of daily living ("ADLs"); mild difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation that were of an extended duration. Tr. at 69. She concluded that the medical evidence of record suggested Plaintiff's mental impairments were non-severe. *Id.* State agency consultant Ruth Ann Lyman completed a second PRTF on June 23, 2013, and similarly determined Plaintiff's mental impairments were non-severe. Tr. at 83–85.

Plaintiff began counseling sessions with Sarah Zovnic ("Ms. Zovnic"), on April 1, 2013. Tr. at 397 Ms. Zovnic initially indicated Plaintiff had excellent motivation, negligible resistance, made constructive use of her sessions, and was highly compliant with treatment, but she later indicated Plaintiff's motivation had decreased; her resistance had increased; she had difficulty focusing on one topic; and her level of compliance with treatment had been reduced. Tr. at 400–18, 469–80. Ms. Zovnic assessed GAF scores of 58 and 59. Tr. at 397–418 and 469–511.

On April 30, 2013, Plaintiff reported pain in her low back and right lower extremity, but indicated she was not in constant pain. Tr. at 437. She stated her pain was exacerbated by walking and was reduced by lying down and elevating her legs. *Id.* Ms. Blease observed Plaintiff to have 5/5 strength in her bilateral lower extremities; intact dorsi and plantar flexion; negative SLR test; 1+ reflexes in her bilateral lower extremities; normal muscle tone; antalgic gait; and grossly intact cranial nerves. *Id.* She stated Plaintiff was adamant that she wanted to go forward with the MILD procedure, but that her insurance policy explicitly stated the procedure was not covered. *Id.* She indicated she would discuss the matter with the finance department. *Id.*

Plaintiff followed up with Ms. Blease on October 1, 2013. Tr. at 441–42. She reported constant pain in her right lower extremity. Tr. at 441. She requested the opportunity to speak with an advocate about a spinal cord stimulator. *Id.* Ms. Blease indicated Plaintiff ambulated with an antalgic gait, but noted otherwise benign findings on examination. *Id.* She noted that Plaintiff could not obtain insurance approval for the MILD procedure, but arranged for her to contact a representative regarding a spinal cord stimulator. Tr. at 442.

On October 10, 2013, Plaintiff underwent phacoemulsification with intraocular lens implantation in her right eye to treat a senile cataract. Tr. at 578.

Ms. Zovnic discharged Plaintiff from counseling services on October 23, 2013, and noted that Plaintiff had discontinued treatment because she had found another counselor who was in her insurance network. Tr. at 512.

On December 2, 2013, Plaintiff reported to Ms. Blease that she was unable to walk without a cane or rollator walker because of impaired balance. Tr. at 443. She complained of bowel and bladder incontinence and indicated she was wearing adult diapers. *Id.* Ms. Blease observed Plaintiff to ambulate with an antalgic gait and to have decreased sensation in her right knee, but she noted no other abnormalities. *Id.* Ms. Blease ordered an MRI of Plaintiff's thoracic spine and referred her to Donald Johnson, M.D. ("Dr. D. Johnson"), for a surgical consultation. Tr. at 444.

Plaintiff presented to Dr. D. Johnson on December 17, 2013. Tr. at 445. Dr. D. Johnson indicated a November 2013 MRI of Plaintiff's lumbar spine showed severe compression at T9-10, with narrowing of the cervical canal to five millimeters. *Id.* He explained that a subsequent MRI of Plaintiff's thoracic spine showed moderate to severe spondylosis at multiple levels and potential nerve-root compression at T9-10 and T10-11, but no myelopathic signal. *Id.* Dr. D. Johnson concluded that Plaintiff was not a candidate for surgical intervention. Tr. at 446. He referred her to a colorectal physician for treatment of bowel incontinence and instructed her to follow up with Dr. Richardson regarding the MILD procedure. *Id.*

Plaintiff returned to Dr. Richardson on January 6, 2014. Tr. at 452. She reported that her bowel incontinence had improved with the addition of Citrucel and described her pain as a two out of 10. *Id.* Dr. Richardson observed Plaintiff to ambulate with an antalgic gait, but noted no other abnormalities on examination. *Id.* He further discussed spinal cord stimulation, and Plaintiff expressed a desire to speak with another patient advocate before going forward with the procedure. Tr. at 453.

On May 6, 2014, Plaintiff presented to Christina Chandler, PA-C ("Ms. Chandler"), for pain management follow up. Tr. at 459–60. She reported pain in her low back that radiated from the lateral aspect of her right knee down to her ankle. Tr. at 459. She indicated she desired to proceed with the psychological evaluation for a spinal cord stimulator. *Id.* Ms. Chandler observed Plaintiff to walk with an antalgic gait and to use a cane, but noted no other abnormalities. *Id.* She prescribed a back brace. Tr. at 460.

Plaintiff presented to Stephen J. Phillips, M.D. ("Dr. Phillips"), on May 8, 2014, for a retinal evaluation. Tr. at 463. She complained of occasional problems with near vision, dry eyes, and tearing. *Id.* Dr. Phillips indicated Plaintiff had been diagnosed with diabetes six years earlier, but maintained great control of her blood sugar. *Id.* He diagnosed macular pucker in both eyes, but indicated Plaintiff had good vision and no diabetic retinopathy. Tr. at 464.

Timothy W. Loebs, MA, LPC ("Mr. Loebs"), completed a medical statement check-off form on June 4, 2014. Tr. at 426–29. He identified Plaintiff's signs and symptoms as sleep disturbance; decreased energy; feelings of guilt or worthlessness; history of suicidal thoughts; generalized persistent anxiety; apprehensive expectation; persistent irrational fear of a specific object, activity, or situation that results in a compelling desire to avoid the dreaded object, activity, or situation; recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week; recurrent obsessions or compulsions which are a source of marked distress; and recurrent and intrusive recollections of a traumatic experience, which are a source of marked

17

distress. Tr. at 426. He indicated Plaintiff had marked restriction of ADLs; marked difficulty in maintaining social functioning; deficiencies of concentration, persistence, or pace resulting in frequent failure to complete tasks in a timely manner; and repeated episodes of deterioration or decompensation in work or work-like settings that resulted in her withdrawal from the situation or exacerbations of signs and symptoms. Tr. at 426–27. He assessed marked impairment in Plaintiff's ability to maintain attention and concentration for extended periods and extreme impairment in her abilities to complete a normal workday and workweek without interruptions from psychologically-based symptoms; to perform at a consistent pace without an unreasonable number and length of rest periods; and to travel in unfamiliar places or use public transportation. Tr. at 427–29.

Plaintiff presented to William G. Kee, Ph. D. ("Dr. Kee"), for an initial psychological evaluation on June 10, 2014. Tr. at 561–63. She assessed her pain as a 44 on a 100-point scale and indicated her pain ranged from 26 to 48 on that scale. *Id.* Dr. Kee administered the Beck Depression Inventory II, and Plaintiff's self-reported depression score fell in the moderate range. Tr. at 562. Plaintiff's self-reported score on the Beck Anxiety Inventory fell in the severe range. *Id.* Her score on the Pain Disability Questionnaire placed her in the severe range of disability secondary to pain. *Id.* Dr. Kee assessed dysthymia, panic disorder, and moderate psychological factors affecting physical condition. Tr. at 563.

On July 22, 2014, Dr. Richardson completed an RFC questionnaire at the request of Plaintiff's attorney.[3] Tr. at 553–58. He stated he had treated Plaintiff on a monthly basis since June 27, 2011. Tr. at 553. He specified her diagnoses included lumbar spinal stenosis and lumbar spondylosis. *Id.* He indicated her symptoms included pain in her back, hip, and leg; fatigue; and bowel and bladder incontinence. *Id.* He stated Plaintiff had reduced ROM in her hip joints and tenderness to palpation. *Id.* He indicated Plaintiff was a malingerer and that emotional factors contributed to the severity of her symptoms. Tr. at 554. He identified Plaintiff's psychological conditions as depression and anxiety. *Id.* He stated Plaintiff's experience of pain was often severe enough to interfere with attention and concentration needed to perform even simple work tasks. *Id.* He indicated Plaintiff was capable of performing low stress jobs. *Id.* Dr. Richardson identified side effects of Plaintiff's medications to include dizziness, sedation, and altered mental status. Tr. at 555. He indicated Plaintiff's impairments had lasted or could be expected to last at least twelve months. *Id.* He stated Plaintiff was capable of walking less than one city block without rest or severe pain. *Id.* He estimated Plaintiff could sit for five to 10 minutes at a time and could stand for five to 10 minutes at a time. *Id.* He stated Plaintiff could sit for less than two hours during an eight-hour workday and could stand for less than two hours during an eight-hour workday. *Id.* He indicated Plaintiff would need to include periods for walking around during an eight-hour workday. *Id.* He stated Plaintiff would need a job that permits shifting positions at will from sitting, standing, or walking

---

[3] Dr. Richardson's responses are handwritten and are somewhat difficult to interpret. *See* Tr. at 553–58.

and would need to take an unscheduled break that lasted from 30 minutes to one hour to lie down on a daily basis. *Id.* He provided that Plaintiff's legs should be elevated for 25 to 40 percent of the time she was sitting. *Id.* He indicated Plaintiff should use a cane while engaging in occasional standing and walking. *Id.* He estimated Plaintiff could occasionally lift 10 pounds or less, but indicated she could never lift 20 pounds or more. *Id.* He stated Plaintiff could rarely twist, but could never stoop (bend), crouch/squat, climb ladders, or climb stairs. Tr. at 557. He indicated Plaintiff's impairments were likely to produce good and bad days and estimated she was likely to be absent from work more than four days per month as a result of her impairments or treatment. *Id.* He stated he did not feel that Plaintiff was capable of working a full-time schedule at any level of exertion. Tr. at 558. Finally, he indicated he felt Plaintiff was disabled as of May 6, 2014. *Id.*

      C.     The Administrative Proceedings

            1.     The Administrative Hearing

At the hearing on July 31, 2014, Plaintiff testified she last worked in August 2007. Tr. at 32. She stated pain in her lower lumbar and thoracic spine prevented her from being able to work. Tr. at 34 and 37. She indicated she had osteoarthritis in her spine. Tr. at 38. She described her pain as a five or six on a 10-point scale. Tr. at 35. She indicated the pain radiated from her back through her right leg and ankle. Tr. at 37–38.

Plaintiff stated her doctors had recommended she undergo the MILD procedure, but indicated she had not pursued it because it was not covered by her insurance. Tr. at 36. She testified she had received injections that provided no relief. Tr. at 36–37. She indicated her doctors had recommended a spinal stimulator and that she had recently

completed a clinical evaluation for it. Tr. at 38. She stated she expected to have the stimulator implanted in January or February. *Id.*

Plaintiff testified she visited a counselor for treatment of depression. Tr. at 46. She indicated she had been suffering from depression since 2006, but stated her depression had improved with medication. Tr. at 46–47. She denied experiencing deep depression, but stated she sometimes cried and thought about her deceased parents. Tr. at 47–48. She indicated she spent time in her bedroom when she was depressed. Tr. at 48.

Plaintiff indicated she was diagnosed with fecal and bladder incontinence in May 2013, but had experienced the symptoms for approximately six months before receiving a diagnosis. Tr. at 49 and 51–52. She stated she had experienced daily fecal incontinence, but indicated it was reduced to three times a week after she restricted her diet. Tr. at 49–51.

Plaintiff testified she experienced constant back pain when she walked. Tr. at 39. She stated she typically experienced the pain if she walked 10 to 15 steps, but could sometimes walk 25 steps before experiencing the pain. *Id.* She indicated she had to sit down, lie down, or bend over after walking. *Id.* She stated she experienced shaking and pain if she stood for more than three to five minutes. *Id.* She indicated she could sit for no longer than 20 minutes at a time. Tr. at 40. She stated she alternated between sitting and standing, but indicated she eventually needed to lie down for approximately 20 minutes before sitting or standing again. Tr. at 40 and 42. She estimated she spent 50 percent of the day lying down. Tr. at 44.

Plaintiff stated she cleaned dishes while leaning against the counter. Tr. at 42. She testified she spent most of her time knitting or performing household chores. Tr. at 52. She indicated she could only perform a chore for five or six minutes at a time before needing to rest. Tr. at 55–56. She stated she used her smartphone often. Tr. at 53. She indicated she used a cane and a walker to ambulate, but denied that either had been prescribed by a doctor. Tr. at 44–45. She testified she drove once a week to a counseling session and to run errands. Tr. at 46. She stated her medications caused dry mouth, but denied that they caused any side effects that affected her ability to work. Tr. at 48–49.

2.     The ALJ's Findings

In his decision dated October 29, 2014, the ALJ made the following findings of fact and conclusions of law:

1.     The claimant last met the insured status requirements of the Social Security Act on December 31, 2012.

2.     The claimant did not engage in substantial gainful activity during the period from her alleged onset date of August 1, 2007 through her date last insured of December 31, 2012 (20 CFR 404.1571 *et seq.*).

3.     Through the date last insured, the claimant had the following severe impairments: degenerative disc disease (20 CFR 404.1520(c)).

4.     Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.     After careful consideration of the entire record, I find that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b); can occasionally climb ramps and stairs; can never climb ladders/ropes/scaffolds; can occasionally stoop, kneel, crouch, and crawl; and must avoid concentrated exposure to hazards.

6.     Through the date last insured, the claimant was capable of performing past relevant work as a human resources clerk. This work did not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

> 7.    The claimant was not under a disability, as defined in the Social Security Act, at any time from August 1, 2007, the alleged onset date, through December 31, 2012, the date last insured (20 CFR 404.1520(f)).

Tr. at 16–21.

## II.    Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)    the ALJ did not adequately assess Plaintiff's credibility;

2)    the ALJ failed to consider Plaintiff's impairments in combination;

3)    the ALJ improperly rejecting Plaintiff's treating physician's opinion; and

4)    the Appeals Council neglected to add new evidence to the record.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

### A.    Legal Framework

#### 1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series

of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[4] (4) whether such impairment prevents claimant from performing PRW;[5] and (5) whether the impairment prevents her from doing substantial gainful employment. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

---

[4] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that her impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[5] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

2.     The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See*

*Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.     Analysis

1.     Credibility

Plaintiff argues the ALJ failed to specify which of her statements he found incredible. [ECF No. 14 at 18]. She maintains the ALJ did not adequately explain which evidence he relied on in discounting her credibility. *Id.* She contends the ALJ's credibility finding was unsupported by substantial evidence because it was contrary to multiple medical opinions of record. *Id.*

The Commissioner argues that substantial evidence supports the ALJ's finding that Plaintiff's subjective complaints were not entirely consistent with the record. [ECF No. 17 at 12]. She contends the ALJ credited Plaintiff's statements to the extent that they were supported by and consistent with the record. *Id.* at 13. She maintains the ALJ relied on Plaintiff's reports to her physicians, physical examinations, and the opinions of the state agency medical consultants. *Id.* at 14. However, she argues the ALJ was not entitled to rely exclusively on subjective evidence to prove her allegations of debilitating pain. *Id.* She maintains the ALJ did not reject Plaintiff's diagnosis of chronic pain, but, rather, found that her pain was not severe enough to be disabling. *Id.* at 15.

After determining that a claimant has a medically-determinable impairment that could reasonably be expected to produce her alleged symptoms, the ALJ should evaluate the intensity, persistence, and limiting effects of her symptoms to determine the limitations they impose on her ability to do basic work activities. SSR 96-7.[6]  If the claimant's statements about the intensity, persistence, or limiting effects of her symptoms are not substantiated by the objective medical evidence, the ALJ is required to consider the individual's credibility in light of the entire case record. *Id.* The ALJ must consider "the medical signs and laboratory findings, the individual's own statements about the symptoms, any statements and other information provided by treating or examining

---

[6] The undersigned notes that the Social Security Administration recently published SSR 16-3p, 2016 WL 1119029 (2016), which supersedes SSR 96-7p, eliminates use of the term "credibility," and clarifies that subjective symptom evaluation is not an examination of an individual's character. Because the ALJ decided this case prior to March 16, 2016, the effective date of SSR 16-3p, the undersigned analyzes the ALJ's decision based on the provisions of SSR 96-7p, which required assessment of the claimant's credibility.

physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record." *Id.* In addition to the objective medical evidence, ALJs should also consider the claimant's ADLs; the location, duration, frequency, and intensity of her pain or other symptoms; factors that precipitate and aggravate her symptoms; the type, dosage, effectiveness, and side effects of her medications; treatment, other than medication, the claimant receives or has received; any measures other than treatment and medications the claimant uses or has used to relieve her pain or other symptoms; and any other relevant factors concerning the claimant's limitations and restrictions. *Id.*

The ALJ must cite specific reason to support his finding on credibility, and his reasons must be consistent with the evidence in the case record. *Id.* His decision must clearly indicate the weight he accorded to the claimant's statements and the reasons for that weight. *Id.* In *Mascio v. Colvin*, 780 F.3d 632, 639–40 (4th Cir. 2015), the court emphasized the need to compare the claimant's alleged functional limitations from pain to the other evidence of record and indicated an ALJ should explain how he decided which of a claimant's statements to believe and which to discredit. The court subsequently stressed that an ALJ's decision must "build an accurate and logical bridge from the evidence" to the conclusion regarding the claimant's credibility. *Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016), citing *Clifford v. Apfel*, 227 F.3d 872 (7th Cir. 2000).

The ALJ stated "[a]fter careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause

the alleged symptoms; however, the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision." Tr. at 18. He proceeded to briefly summarize Plaintiff's testimony, the medical records, and the opinion evidence. *See* Tr. at 18–20.

The ALJ acknowledged that Plaintiff testified she could walk 20 to 25 steps, could stand for three to five minutes, could sit for 20 minutes, and spent half of a typical day lying down, but he cited no evidence of record that refuted these statements. *See id.* He discussed findings of moderately-severe spondylosis in the context of scoliosis with probable nerve-root compression and described a waxing and waning of Plaintiff's pain-related complaints. Tr. at 18–19. However, he declined to explain how the objective signs and Plaintiff's reports to her physicians were inconsistent with her hearing testimony. Thus, the ALJ failed to specify reasons and cite evidence in support of his credibility finding.

The ALJ also mischaracterized and failed to consider some of the evidence in assessing Plaintiff's mental impairments. He indicated Plaintiff's GAF score of 55 "typically denotes nondisabling symptoms." Tr. at 19. In fact, a GAF score of 51–60 indicates "moderate symptoms (e.g., circumstantial speech and occasional panic attacks) OR moderate difficulty in social or occupational functioning (e.g., few friends, conflicts with peers or co-workers)." *DSM-IV-TR.* Although a GAF score of 55 is not disabling in and of itself, the moderate limitations it imposes would likely have some effect on Plaintiff's RFC. The ALJ also indicated Plaintiff's counseling records demonstrated that she "routinely presented with good motivation and only mild resistance to therapy"; "was

noted to have a moderate degree of compliance with treatment"; "was able to accurately identify and express her feelings"; "demonstrated the ability to see different perspectives"; and "made constructive use of the therapy sessions." Tr. at 19. However, as indicated in the summary of the record above, the counseling records did not always reflect such positive findings. *See generally* Tr. at 374–422 and 468–523. The ALJ cited some of Dr. Lux's findings, but he neglected Dr. Lux's indications that Plaintiff's physical and emotional problems were connected. Tr. at 364. He referenced some of Dr. Kee's findings, but ignored Plaintiff's test scores that were consistent with moderate depression, severe anxiety, and a severe range of disability secondary to pain. *See* Tr. at 562.

The ALJ's credibility assessment also fails to reflect consideration of all the statements of record from Plaintiff's treatment providers regarding the effect of her symptoms. The ALJ ignored Mr. Forbus's indication that Plaintiff would require rest breaks and the ability to frequently alternate between sitting and standing in a work setting. *See* Tr. at 339. He also declined to consider the GAF scores assessed by Ms. Cogdell-Quick (Tr. at 420), Ms. Horton (Tr. at 316 and 374–96), Dr. Lux (Tr. at 364), and Ms. Zovnik (Tr. at 397–418 and 469–511) that suggested Plaintiff's mental impairments imposed moderate limitations on her ability to work.

In light of the foregoing, the undersigned recommends the court find the ALJ failed to build an accurate and logical bridge between the evidence and his conclusion that Plaintiff's statements were not entirely credible.

2.    Combination of Impairments

Plaintiff argues the ALJ failed to consider the combined effect of her physical and mental impairments. [ECF No. 14 at 23]. She maintains that proper consideration of the combined effect of her impairments directed a finding that she was unable to perform her PRW and was disabled. *Id.*

The Commissioner argues the ALJ specifically stated that he considered the combined effect of Plaintiff's impairments. [ECF No. 17 at 16]. She maintains the ALJ's decision reflects his consideration of Plaintiff's mental and physical impairments and that he was not required to consider diagnoses that caused no functional limitations in assessing the RFC. *Id.* at 16–17. She contends the ALJ carefully considered evidence of Plaintiff's mental condition, but reasonably concluded that it caused no more than minimal limitation. *Id.* at 17.

In determining whether a claimant's physical or mental impairments are severe enough to support a finding of disability, an ALJ must consider the combined effect of all the claimant's impairments, "without regard to whether any such impairment, if considered separately, would be of sufficient severity." 20 C.F.R. § 404.1523. The combined effect of the individual's impairments should be considered at each stage of the disability determination process. *See id.* When a claimant has multiple impairments, the statutory and regulatory scheme for making disability determinations, as interpreted by the Fourth Circuit, requires that the ALJ consider the combined effect of all those impairments in determining the claimant's RFC and her disability status. *See Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989); *see also Saxon v. Astrue*, 662 F. Supp. 2d 471,

479 (D.S.C. 2009) (collecting cases in which courts in this District have reiterated the importance of the ALJ's explaining how he evaluated the combined effects of a claimant's impairments). The ALJ must "consider the combined effect of a claimant's impairments and not fragmentize them." *Id.* at 50. "As a corollary, the ALJ must adequately explain his or her evaluation of the combined effects of the impairments." *Id.* The Fourth Circuit has declined to elaborate on what serves as adequate explanation of the combined effect of a claimant's impairments. *See Cox v. Colvin*, No. 9:13-2666-RBH, 2015 WL 1519763, at *6 (D.S.C. Mar. 31, 2015); *Latten-Reinhardt v. Astrue*, No. 9:11-881-RBH, 2012 WL 4051852, at *4 (D.S.C. Sept. 13, 2012). However, this court has specified that "the adequacy requirement of *Walker* is met if it is clear from the decision as a whole that the Commissioner considered the combined effect of a claimant's impairments." *Brown v. Astrue*, C/A No. 0:10-CV-1584-RBH, 2012 WL 3716792, at *6 (D.S.C. Aug. 28, 2012), *citing Green v. Chater*, 64 F.3d 657, 1995 WL 478032, at *3 (4th Cir. 1995)). Furthermore, absent evidence to the contrary, the courts should accept the ALJ's assertion that he has considered the combined effect of the claimant's impairments. *See Reid v. Commissioner of Social Sec.*, 769 F.3d 861, 865 (4th Cir. 2014); *see also Hackett v. Barnhart*, 395 F.3d 1168, 1173 (10th Cir. 2005) ("[O]ur general practice, which we see no reason to depart from here, is to take a lower tribunal at its word when it declares that it has considered a matter.").

The ALJ assessed degenerative disc disease as Plaintiff's only severe impairment. Tr. at 16. He considered Listings 1.04 and 12.04, but concluded that Plaintiff's impairments, singularly and in combination, failed to meet or equal either Listing. Tr. at

16–18. He determined Plaintiff's mental impairments were non-severe because she had mild restriction of ADLs; mild difficulties in social functioning; mild difficulties in concentration, persistence, or pace; and no episodes of decompensation. Tr. at 17. He stated the RFC assessment reflected the degree of mental limitation he assessed and noted that Plaintiff's impairments, "when considered in combination with one another, fail to diminish her overall level of functioning beyond that set forth" in the assessed RFC. Tr. at 17–18. The ALJ assessed an RFC that allowed for the performance of light work with occasional climbing of ramps and stairs, stooping, kneeling, crouching, and crawling; no climbing of ladders, ropes, or scaffolds; and avoidance of concentrated exposure to hazards. Tr. at 18.

Although the ALJ recites he considered the combined effect of Plaintiff's physical and mental impairments in assessing her RFC, he included no mental restrictions in his assessment. *See* Tr. at 17–18. The examining and treating physicians assessed multiple mental health-related diagnoses. *See* Tr. at 316, 339, and 361 (indicating diagnoses of depression and anxiety), 364 (assessing adjustment disorder with mixed anxiety and depressed mood and PTSD), 420 (assessing pain disorder associated with psychological factors and medical condition, dysthymic disorder, PTSD, and personality disorder, NOS), and 563 (diagnosing dysthymia, panic disorder, and psychological factors affecting physical condition). As discussed above, the ALJ neglected and mischaracterized elements of the record that pertained to Plaintiff's mental impairments and the limitations they imposed. Therefore, substantial evidence does not support his conclusion that Plaintiff's mental impairments imposed no limitations. Despite

assessments from Drs. Lux, Richardson, and Kee that suggested Plaintiff's mental and physical problems were intertwined, the ALJ's decision reflects no recognition of the suggested connection between the two. *See* Tr. at 364, 554, and 562. In light of these failures, the undersigned recommends the court find the ALJ did not adequately assess the combined effect of Plaintiff's impairments.

### 3.    Treating Physician's Opinions

Plaintiff argues the ALJ summarily dismissed her treating physician's opinion as "inconsistent with the medical record." [ECF No. 14 at 24]. She maintains the ALJ overlooked the opinions of the majority of the physicians who evaluated her impairments. *Id.* at 25. She contends the ALJ should have afforded controlling weight to Dr. Richardson's opinion because it was supported by the medical evidence. *Id.*

The Commissioner argues the ALJ discussed and identified the evidence in the record that contradicted Dr. Richardson's RFC assessment. [ECF No. 17 at 21]. She maintains the ALJ reasonably gave the opinion little weight because it was inconsistent with the clinical findings and unsupported by the weight of the evidence. *Id.*

The regulations require that ALJs accord controlling weight to treating physicians' medical opinions that are well-supported by medically-acceptable clinical and laboratory diagnostic techniques and that are not inconsistent with the other substantial evidence of record. 20 C.F.R. § 404.1527(c)(2); SSR 96-2p. However, if the ALJ determines that the treating physician's opinion is not entitled to controlling weight, he is required to evaluate all the opinions of record based on the factors in 20 C.F.R. § 404.1527(c). *Id.* Those factors include (1) the examining relationship between the claimant and the

medical provider; (2) the treatment relationship between the claimant and the medical provider, including the length of the treatment relationship and frequency of treatment and the nature and extent of the treatment relationship; (3) the supportability of the medical provider's opinion in his treatment records; (4) the consistency of the medical opinion with other evidence in the record; and (5) the specialization of the medical provider offering the opinion. *Johnson*, 434 F.3d at 654; 20 C.F.R. § 404.1527(c).

ALJs are not required to expressly discuss each factor in 20 C.F.R. § 404.1527(c), but their decisions should demonstrate that they considered and applied all the factors and accorded each opinion appropriate weight in light of the evidence of record. *See Hendrix v. Astrue*, No. 1:09-1283-HFF, 2010 WL 3448624, at *3 (D.S.C. Sept. 1, 2010). "[C]ourts have consistently held that unexplained and rote observations that an opinion is simply inconsistent with treatment notes or the record, by itself, is not a sufficient basis to reduce the opinion's weight." *Lydia v. Astrue*, No. 2:11-1453-DCN-BHH 2012 WL 3304107, at *10 (D.S.C. July 25, 2012), *adopted by* 2012 WL 3308108 (D.S.C. Aug. 13, 2012), *citing Cagle v. Astrue*, 266 F. App'x 788 (10th Cir. 2008) ("stating 'the ALJ failed to explain or identify what the claimed inconsistencies were between opinion and the other substantial evidence in the record,' and concluded that the ALJ's reasoning was not 'sufficiently specific to enable this court to meaningfully review his findings'"); *Langley v. Barnhart*, 373 F.3d 1116, 1122 (10th Cir. 2004). It is not the role of this court to disturb the ALJ's determination as to the weight to be assigned to a medical source opinion "absent some indication that the ALJ has dredged up 'specious inconsistencies,' *Scivally v. Sullivan*, 966 F.2d 1070, 1077 (7th Cir. 1992), or has not given good reason for the weight

afforded a particular opinion." *Craft v. Apfel*, 164 F.3d 624, 1998 WL 702296, at *2 (4th Cir. 1998) (unpublished table decision) (per curiam).

The ALJ summarized Dr. Richardson's opinion, but gave it little weight because it was "inconsistent with the relatively benign clinical findings" and was "unsupported by the weight of the evidence of record." Tr. at 20.

A review of the ALJ's decision reveals no meaningful consideration of the relevant factors in 20 C.F.R. § 404.1527(c). Although the ALJ stated Dr. Richardson's opinion was inconsistent with "the relatively benign clinical findings" and "weight of the evidence of record," he cited no actual inconsistencies in the evidence. *See* Tr. at 20. His summary referenced MRI findings of multilevel severe spondylosis, scoliosis, and probable nerve-root compression, as well as objective evidence of decreased strength and sensation and antalgic gait (Tr. at 18–19). However, he declined to explain his conclusion that these were "relatively benign clinical findings" and did not clarify how the restrictions Dr. Richardson provided were inconsistent with the record as a whole. Therefore, his decision to decline controlling weight to Dr. Richardson's opinion was unsupported. *See Lydia*, 2012 WL 3304107, at *10; *see also* 20 C.F.R. § 404.1527(c)(2); SSR 96-2p. The ALJ's decision also reflects no consideration of Dr. Richardson's status as a treating and examining physician or his pain management specialization. *See* 20 C.F.R. § 404.1527(c)(1), (2), (5). In fact, his summary of the medical evidence does not even reference Dr. Richardson as a medical provider. *See* Tr. at 18–19. In light of the foregoing, the undersigned recommends the court find the ALJ did not adequately consider Dr. Richardson's opinion.

36

4.    Evidence Submitted to Appeals Council

On July 7, 2015, Dr. Richardson completed a medical opinion questionnaire. [ECF No. 14-1]. He opined that, as a result of pain and weakness in her back and legs, Plaintiff could sit for less than an hour; stand for less than an hour; and walk for less than an hour during an eight-hour workday. [ECF No. 14-1 at 1]. He indicated Plaintiff could occasionally lift and carry up to 10 pounds, but could never lift over 10 pounds because of pain and weakness. *Id.* at 2. He stated Plaintiff could sit for 15 to 30 minutes before changing positions and stand for five to 10 minutes at a time. *Id.* He opined that Plaintiff could use her bilateral hands for simple grasping and fine manipulation, but could not engage in repetitive pushing and pulling because of pain and weakness. *Id.* at 3. He estimated Plaintiff would be absent from work more than four times per month because of her impairments. *Id.* He indicated Plaintiff was unable to bend, squat, crawl, climb, reach overhead, stoop, crouch, or kneel. *Id.* at 3–4. He stated Plaintiff's physical impairments caused pain and indicated her pain was consistent with MRI findings. *Id.* at 4. He suggested Plaintiff had no problem dealing with a low level of stress, but experienced anxiety when dealing with moderate levels of stress. *Id.* He indicated Plaintiff experienced drowsiness and impaired concentration as side effects of her medications. *Id.*

Plaintiff argues the Appeals Council erroneously found that Dr. Richardson's pertained to the period after her date last insured. [ECF No. 14 at 26]. The Commissioner maintains Dr. Richardson's July 7, 2015 opinion was neither new nor material, but admits

the Appeals Council articulated flawed reasoning in rejecting the opinion. [ECF No. 17 at 22–24].

Because this case must be remanded to the Commissioner for reevaluation of Plaintiff's credibility, her combination of impairments, and the medical opinion evidence, the undersigned declines to specifically address the newness and materiality of Dr. Richardson's 2015 opinion. However, upon remand, the Commissioner should reevaluate the opinion and cite substantial evidence for the weight she accords it.

III.    Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence. Therefore, the undersigned recommends, pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions under sentence four of 42 U.S.C. § 405(g), that this matter be reversed and remanded for further administrative proceedings.

IT IS SO RECOMMENDED.

September 26, 2016                         Shiva V. Hodges
Columbia, South Carolina                  United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).